# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

JEREMY RAY LOVELADY,

        Plaintiff,

    v.

DR. BEAMER; MS. WETTLAUGHER; MS. GARTON,

        Defendants.

Case No. 2:16-cv-01614-PK

**OPINION AND ORDER**

**PAPAK, Magistrate Judge:**

## INTRODUCTION

Plaintiff *pro se* Jeremy Ray Lovelady brought this action against Dr. Leland Beamer, Dorothy Wettlaufer[1], and Jaylene Garton (collectively "Defendants") alleging that he is entitled to a declaratory judgment, injunctive relief, and damages under 42 U.S.C. § 1983 for violations of his Eighth Amendment rights. Plaintiff also alleges that he is entitled to a declaratory judgment that Defendant Beamer was negligent. This court has federal-question jurisdiction over Plaintiff's section 1983 claim pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law tort claim pursuant to 28 U.S.C. § 1367.

---

[1] Plaintiff misspelled Defendant Wettlaufer's name in the caption of his complaint.

Now before the court is Defendants' partial motion for summary judgement (# 49), and Plaintiff's motion for preliminary injunction (# 4). I have considered the motions and all of the briefings, papers, and pleadings on file. For the reasons discussed below, Defendants' partial motion for summary judgement is GRANTED and Plaintiff's motion for preliminary injunction is DENIED.

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S. Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may

neither make credibility determinations nor perform any weighing of the evidence. *See, e.g.,* *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## II. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must establish (1) that they are *likely* to succeed on the merits; (2) that they are *likely* to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id.* at 20; *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Alternatively, in the Ninth Circuit, a "sliding scale" approach may be undertaken. *All. for the Wild Rockies*, 632 F.3d at 1131–35 (noting that the "'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test"). The Ninth Circuit's sliding scale approach permits a weaker showing of success on the merits to be offset by a stronger showing of irreparable harm where the other two elements of the *Winter* test are met. *Id.* at 1131. Specifically, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

## FACTUAL BACKGROUND

### I. The Parties

Plaintiff was a prisoner incarcerated at Eastern Oregon Correctional Institution ("EOCI") on October 9, 2014—the date on which Plaintiff sustained the injuries giving rise to this action.

Plaintiff remained at EOCI until June 28, 2016, when he was transferred to Oregon State Penitentiary ("OSP").

Defendant Beamer is a doctor at EOCI and is alleged to have been in charge of Plaintiff's medical care at the time of the events giving rise to this action.

Defendant Wettlaufer is the medical manager at EOCI. She is alleged to be in charge of medical staff and procedures related to EOCI inmates.

Defendant Garton is EOCI's outside medical care coordinator.

## II.     Material Background

### A.     The Administrative Remedy Program at EOCI

For the purposes of whether Plaintiff had access to administrative remedies, Plaintiff was housed at EOCI at all material times.[2] At EOCI, Plaintiff had available to him a three-level grievance procedure consistent with the regulations set forth in Chapter 291, Division 109 of the Oregon Administrative Rules. Inmates are informed of the grievance process through an Inmate Orientation Packet, through the inmate handbook, and through grievance instructions accompanying grievance forms.

Pursuant to the EOCI grievance procedures and applicable Oregon Administrative Rules, "[i]f an inmate is unable to resolve an issue through informal communications, [the] inmate may seek resolution of the issue by submitting a written grievance using the department's approved inmate grievance form (CD 117)." OAR-291-109-0140(1)(a). Any such grievance "must include a complete description of the incident, action, or application of the rule being grieved,

---

[2] Plaintiff was housed at EOCI from February 15, 2011 to January 6, 2016. Plaintiff was transferred to Two Rivers Correctional Institution on January 6, 2016 and returned to EOCI on January 8, 2016. Plaintiff remained at EOCI until June 28, 2016, when he was transferred to Oregon State Penitentiary. As Plaintiff's injuries arose while he was housed at EOCI and all of his grievances were filed at EOCI, the court need only consider whether administrative remedies were available at EOCI.

including date and approximate time," and should be accompanied by any referenced documents. OAR-291-109-0140(1)(b). Matters, actions, and incidents that an inmate may properly grieve are the "misapplication of any administrative directive or operational procedure," the "lack of an administrative directive or operational procedure," any "unprofessional behavior or action which may be directed toward an inmate by an employee or volunteer of [ODOC] or the Oregon Corrections Enterprises," any "oversight or error affecting an inmate," any "program failure as defined in . . . OAR-291-077-0020," except where such failure was caused by the inmate's misconduct, or the "loss or destruction of [the inmate's] property. . . ." OAR-291-109-0140(2). "An inmate grievance may request review of just one matter, action, or incident per inmate grievance form." OAR-291-109-0140(1)(d). Similarly, inmates are not permitted to file more than one grievance regarding a single incident or issue unless more than one ODOC employee is directly involved in the incident. OAR-291-109-0140(5). In addition, inmates are not permitted to grieve any claim or issue "that the inmate is pursuing in pending litigation in state or federal courts." OAR-291-109-0140(3)(h). A grievance will not be processed unless it is received by the applicable grievance coordinator on form CD 117 "within 30 calendar days of the date of the incident giving rise to the grievance." OAR-291-109-0150(2).

Upon receipt of an inmate grievance, a grievance coordinator is required to "assign the grievance a number, date stamp, and record its receipt in an inmate grievance log" and to "send a grievance receipt to the inmate." OAR-291-109-0160(1) and (1)(a). The grievance coordinator is then required to coordinate with the ODOC employee best suited to respond to the grievance, and to send the inmate's grievance to that person "for reply." OAR-291-109-0160(1)(b). The response must "be returned to the grievance coordinator for processing within 21 calendar days." OAR-291-109-0160(1)(c). Following such processing, the grievance coordinator is required to

send the inmate copies of both the grievance and the response, and to retain copies for the grievance coordinator's files, all within "45 days from the date the grievance was received" by the grievance coordinator, "unless further investigation is necessary." OAR-291-109-0160(2) and (2)(a). In the event the grievance coordinator fails to complete processing of the grievance within 45 days of its receipt, "the grievance coordinator will make an effort to notify the inmate of the status of the grievance." OAR-291-109-0160(2)(b). "If the inmate does not receive a response within the allotted time frame, he/she may contact the grievance coordinator." *Id.*

"If at any time the grievance coordinator determines the inmate has pursued his/her grievance through state or federal courts, the grievance process will cease and the grievance will be returned to the inmate." OAR-291-109-0160(4). "A grievance that has been returned to [an] inmate by the grievance coordinator for procedural reasons cannot be appealed." OAR-291-109-0160(5).

An inmate may appeal the institutional response to the inmate's grievance by and through "the grievance appeal form (CD 117c)." OAR-291-109-0170(1)(a). Any such appeal "must be submitted to the grievance coordinator together with the original grievance, attachments, and staff response(s)." *Id.* The scope of the originally submitted grievance cannot be expanded on appeal, and the inmate is not permitted to add new information regarding the grieved incident on appeal, except where such information was unavailable to the inmate at the time the original grievance was filed. *See id.* Any such appeal must be received by the grievance coordinator "within 14 days from the date that the grievance response was sent to the inmate from the grievance coordinator." OAR-291-109-0170(1)(b). The grievance coordinator is required to send the appeal to the "functional unit manager," who is required to respond to the appeal "within 30 calendar days." OAR-291-109-0170(1)(a)(B) and (1)(d). The grievance coordinator

is then required to send the functional unit manager's appeal response to the inmate. *See* OAR-291-109-0170(1)(d).

In the event an inmate wishes to appeal the functional unit manager's decision regarding a grievance appeal, the inmate may do so "using the grievance appeal form (CD 117c)." OAR-291-109-0170(2)(a). Any such appeal "must be submitted to the grievance coordinator together with the original grievance, attachments, staff responses, and documentation related to the first grievance appeal." *Id.* The grievance coordinator must generally receive any such appeal "within 14 calendar days from the date that the first grievance appeal response was sent to the inmate from the grievance coordinator." OAR-291-109-0170(2)(c). As with the first appeal, appeal of the functional unit manager's response cannot expand the scope of the original grievance, and cannot adduce new information regarding the originally grieved incident, except where such information was unavailable to the inmate at the time the original grievance or first appeal was filed. *See* OAR-291-109-0170(2)(a)(A). The grievance coordinator is required to forward any such appeal to "the Assistant Director having authority to review and resolve the issue." OAR-291-109-0170(2)(a)(B).

The Assistant Director with such authority is required to respond to any such appeal from a functional unit manager's grievance appeal response "within 30 calendar days." OAR-291-109-0170(2)(e). "The Assistant Director's . . . decision on an inmate's grievance appeal is final, and is not subject to further [administrative] review." OAR-291-109- 0170(2)(f).

## B.    Facts Underlying the Parties' Dispute

Plaintiff alleges a number of medical problems including bulging discs in his back, degenerative disc disease, arthritis, a nerve pinching his right testicle, and loss of function in his

bladder and penis. While it appears as that Plaintiff has had medical problems for some time, Plaintiff suggests that his claims are related to events arising in October, 2014.

On October 7, 2014, Plaintiff complained of lower back pain to Dr. Timothy Kelly. Dr. Kelly administered several Toradol injections to ease Plaintiff's pain. Plaintiff was unsatisfied. Plaintiff stated that he may do a "man down" in order to get assistance. According to Amy Mann, NP, a "man down" call alerts security and medical staff to an emergency medical episode involving an inmate and prompts an immediate response. Plaintiff denies that he made these remarks and suggests that his records have been altered.

On October 9, 2014, Plaintiff claims to have fallen head first down a flight of stairs. When EOCI medical staff found him, Plaintiff stated that he had pain in his left cervical neck and spasms down his left lower lumbar region. Plaintiff had no open wounds or contusions. Plaintiff was placed in a c-collar and transported to St. Anthony Hospital for x-rays. He was given Toradol injections for his pain and was returned to his unit.

Plaintiff continued to seek medical assistance throughout October, 2014. Dr. Kelly reviewed Plaintiff's x-rays. They showed slight retrolisthesis and loss of disc height at levels L3-L4 as well as degenerative disc disease at levels L5-S1. A second x-ray showed no evidence of instability or malalignment of the vertebral body. Plaintiff also reported pain radiating down his side to his right testicle and right knee. The afflicted area was tender to touch but there was no swelling or bruising.

In November and December 2014, Plaintiff received a lumbar spine MRI and an abdominal CT scan. According to Plaintiff's medical file, Plaintiff's chart notes and a referral were sent by facsimile to Kadlec Neuroscience Center for review on December 6, 2014. On December 12, 2014, Plaintiff's abdominal CT scan was also sent to Kadlec Neuroscience. On

December 22, 2014, Kadlec Neuroscience records show that Kadlec Neuroscience staff presented Plaintiff's file to Dr. Matthew Fewel for a scheduling recommendation. Prison staff contacted Kadlec Neuroscience on December 31, 2014, to check on Plaintiff's referral. Kadlec Neuroscience informed prison staff that they were waiting on Dr. Fewel to return from time off. On January 4, 2015, Kadlec records show that Dr. Fewel reviewed Plaintiff's records and recommended that Plaintiff see Dr. Baldwin. Dr. Fewel did not believe Plaintiff to be a surgical candidate. Plaintiff was scheduled for Dr. Baldwin's earliest available appointment.

On January 5, 2015, Plaintiff complained of back pain and pain radiating down his leg. Plaintiff was given a Toradol injection and prescribed additional injections. However, he complained to prison staff that: "Toradol doesn't do shit for me. Maybe I'll fall out on the unit. What am I, a piece of shit? I'll just file another lawsuit."

On February 4, 2015, Plaintiff was seen at Kadlec Neuroscience to address his lower back pain. Lisa Miller, ARNP, found that Plaintiff had significant tenderness over his right sacroiliac joint and found that his pain was consistent with sacroilitis. Plaintiff was given a right sacroiliac joint steroid injection. Plaintiff was given an additional right sacroiliac joint steroid injection on February 27, 2015.

On March 6, 2015, Plaintiff received a cervical spine MRI at St. Anthony Hospital. Plaintiff was diagnosed with degenerative disc disease and spondylosis at C3-C4. According to Ms. Mann's declaration, "[d]egenerative disc disease . . . commonly develops over the course of human aging and results from the effects of natural daily stresses and minor injuries." "While surgical options are available in serious cases, [Plaintiff] has not been evaluated to be a surgical candidate following his October 2014 fall." Plaintiff urged prison officials to send his MRI to

Kadlec Neuroscience on March 13, 2015 and March 27, 2015. Plaintiff was allegedly informed that his provider must issue an order to have his MRI forwarded to Kadlec Neuroscience.

Plaintiff filed two grievances at the end of March, 2015 that the court will address.[3] On March 25, 2015, EOCI received Grievance No. EOCI.2015.03.049 from Plaintiff, grieving inadequate medical care as follows:

> I've been having serious pain in my spine for about 5 years now. I tumbled down the stairs on 10/9/14 from my back going out on me. I have been telling medical since this happen[ed] that I'm suffering [immensely]. I have not received pain medication for this and I received an MRI on 3-6-15 and it showed a [c]ompromise of the neural foramina [at] C3-6 which clearly is causing a lot of pain. I've tried to be [patient], but past experiences have showed me that the doctors here do not have my best [interests]. Dr. Beamer can explain that one!

Plaintiff sought pain medication and further treatment for his condition. EOCI construed this grievance as addressing Defendant Wettlaufer's actions.

On March 30, 2015, EOCI received Grievance No. EOCI.2015.03.050 from Plaintiff, grieving inadequate medical care as follows:

> I put in for sick call and I didn't get a call out for a week later I had to remind them, and I'd like it to be known that Dr. Kelly I feel is messing with me. I got an MRI and have asked several times if it has been sent to Kadlec Neuro Science but Dr. Kell[y] will not put an order for them to look at it. I'm letting it be known I plan to [f]ile a lawsuit against Dr. Kelly after grievance procedure is complete for un[n]eeded pain [and] suffer[ing] and for medical indifference on a known medical issue.

Plaintiff sought medical treatment addressing his issues. EOCI construed this grievance as addressing Defendant Wettlaufer's actions.

ODOC physician's orders dated March 31, 2015 state "send cervical MRI report to Kadlec Neuroscience."

---

[3] Defendants note in their partial motion for summary judgment that Plaintiff filed an additional grievance on March 30, 2015—grievance number EOCI.2015.03.052. As neither party has submitted this grievance in full to the court and Plaintiff did not appeal this grievance, the court will not and need not address it.

Each of the aforementioned grievances were addressed on April 6, 2015. Defendant Wettlaufer replied to Grievance No. EOCI.2015.03.049 through a grievance response. The grievance response noted that Plaintiff was sent to Kadlec Neuroscience on February 4, 2015. At Kadlec Neuroscience, Plaintiff was given steroid injections for his back and prescribed NSAIDS for his pain. Prison staff were "waiting for Kadlec Neuroscience to review [Plaintiff's] MRI and make recommendations." Plaintiff's treatment plan would be based on those recommendations. The record does not show that Plaintiff appealed this response.

EOCI Grievance Coordinator Nina Sobotta returned Grievance No. EOCI.2015.03.050 due to non-compliance with the applicable grievance rules. Ms. Sobotta found that Plaintiff's grievance failed to "include a complete description of the incident, action, or application of rule, including date, approximate time and what action requested to resolve [the] grievance." The record does not show that Plaintiff resubmited this grievance or otherwise appealed Ms. Sobotta's response.

On April 21, 2015 Plaintiff reported to sick call to ask whether his MRI results had been sent to Kadlec Neuroscience. Plaintiff was advised that a phone call was made but Defendant Garton had not heard back from Kadlec Neuroscience.

A "late entry" in ODOC progress notes dated May 7, 2015 states that Defendant Garton received a phone call from Kadlec Neuroscience on May 5, 2015 regarding Plaintiff's "C-Spine MRI." At that time, "Dr. Baldwin only recommend[ed] physical therapy . . . ." Defendant Garton allegedly spoke to Dr. Kelly regarding the phone call, who wrote an order for physical therapy.

Plaintiff's medical issues continued for several months. On May 6, 2015, Plaintiff complained that he felt a pinching in his head, that he was seeing stars, and that he had a blown

disk. Plaintiff received a Toradol injection but complained that Toradol was not addressing his pain. On June 5, 2015, Plaintiff complained of extreme pain and pressure in his neck. Plaintiff was seen the next day, receiving Norco for pain. On June 9, 2015, Plaintiff reported that he had thrown away his soft c-collar neck brace that was prescribed in March, 2015. On July 30, 2015, Plaintiff was seen for his neck, back, and testicular pain. The provider submitted a request for Plaintiff to be reevaluated for an epidural steroid injection.

On August 6, 2015, Plaintiff sent a kyte to Defendant Beamer stating that he thought he was being ignored. He complained that Elavil was giving him bad side effects but if he did not take it, his "pain scale [was] through the roof." Plaintiff's medication was switched on August 11, 2014 but his side effects persisted. On August 14, 2015, Plaintiff sent a kyte to Defendant Beamer complaining that his new medication was "making [him] sick and they are causing black out periods where [he was] not remembering things." He worried that his brain was being damaged by his medical treatment and was concerned that prison staff had ulterior motives.

According to a document that Plaintiff claims reflects "Kadlec's referral notes," Kadlec received Plaintiff's chart notes on September 11, 2015. These internal notes state that they "[r]eceived updated referral chart notes for Pt to followup on care." "OK to schedule FU with Baldwin/Lisa." Plaintiff claims that his referral notes included the MRI results from his March 6, 2015 MRI. Prior to the September 11, 2015, entry, the only other entries in the document provided by Plaintiff are entries in January, 2015—entries prior to his March 6, 2015 MRI.

On September 29, 2015, Defendant Garton's notes state that Plaintiff was scheduled for reevaluation with Dr. Baldwin at Kadlec Neuroscience.

Plaintiff saw Lisa Miller, ARNP, at Kadlec Neuroscience on October 15, 2015. Ms. Miller reviewed Plaintiff's MRI, noting that it displayed "cervical spondylosis with degenerative

disc disease at C3-4 resulting in mild foraminal narrowing." Ms. Miller recommended a C7-T1

cervical epidural steroid injection under fluoroscopic guidance. If there was no improvement,

then she would consider diagnostic median branch blocks.

Defendant Beamer saw Plaintiff on October 27, 2015. Plaintiff complained of neck pain

and lower back pain. He was having difficulty sleeping. His neck brace was not helpful.

Defendant Beamer concluded that Plaintiff's subjective complaints did not match Defendant

Beamer's objective findings.

On October 29, 2015, EOCI received two grievances filed by Plaintiff. Plaintiff filed

Grievance No. EOCI.2015.10.078 grieving inadequate medical care as follows:

> Per 291-109-0100, Inmate has [gone] above and beyond to resolve this issue . . .
> On 10/27/15 Inmate Lovelady had doctors apt and Dr. Beamer told me he will put
> in for pain medica[tion] but he never did. Dr. Beamer told me I was delusional
> about my MRI findings and he said he's going to call all outside providers to put a
> stop to my procedures because he feels I do not need them? I told him I didn't
> discuss my T.X. so that he can sabotage my medical T.X..

Plaintiff wanted Defendant Beamer to "pay the consequences for his actions . . . [as] this

[wa]sn't the first time." EOCI construed this grievance as addressing Defendant Beamer's

actions.

That same day, Plaintiff filed Grievance No. EOCI.2015.10.086. Plaintiff grieved as

follows:

> Per Rule # 291-109-0100, Inmate has [t]ried everything possible to seek help
> through com[m]unication kytes . . . On 9-30-15 I received my medical records
> from Kadlec Neuro Science and my cervical MRI was never sent by Ms. Garton
> even after several [a]ttempts to send com[m]unication kytes . . . It was only sent
> right before a visit ordered by Ms. Wettlau[fer] as updated referral chart notes? on
> 9/11/15.

In a document attached to this grievance, Plaintiff noted that Ms. Garton stated that she spoke

with someone at Kadlec Neuroscience on May 7, 2015 regarding Plaintiff's MRI. Yet, Kadlec

Neuroscience records indicated that they did not receive Plaintiff's MRI until September 11, 2015. Plaintiff alleged that "Ms. Garton was told by Mr. Beamer to not send in [his] MRI . . . ." Plaintiff wanted "people" to be held accountable for neglecting his medical needs. EOCI construed this grievance as addressing Defendant Garton's actions.

EOCI's Therapeutic Level of Care ("TLC") Committee approved Plaintiff's cervical epidural steroid injection on October 27, 2015, and Plaintiff received the injection at Kadlec Neuroscience on November 30, 2015.

Defendant Wettlaufer responded to Grievance No. EOCI.2015.10.078 on November 17, 2015. The record does not show that Plaintiff appealed this response.

Defendant Wettlaufer responded to Grievance No. EOCI.2015.10.086 on November 20, 2015. Defendant Wettlaufer stated, "I understand that you feel your MRI was sent to Kadlec late." She apologized for the delay and opined that it was "possible that [the MRI] was sent and lost." Plaintiff subsequently filed a grievance appeal, arguing that Defendant Garton was deliberately indifferent to his medical needs and that Defendant Garton falsely stated in Plaintiff's medical records that she learned of Kadlec Neuroscience's assessment of Plaintiff's MRI results on May 7, 2015.

S. Shelton, M.D., DOC's medical director, responded to Plaintiff's appeal on January 6, 2016. Dr. Shelton stated that "[n]o one ha[d] lied in [Plaintiff's] health care record." He apologized if Plaintiff's "Magnetic Resonance Imaging [] was sent to Kadlec Neuroscience center late." Plaintiff filed a second grievance appeal, again arguing that Defendant Garton falsely stated that she spoke with someone at Kadlec Neuroscience. Grievance Coordinator Nina Sobotta's declaration states that Plaintiff completed the grievance review process for Grievance No. EOCI.2015.10.086.

Plaintiff's pain complaints continued. On February 2, 2016, Plaintiff sought medical attention for low back and hip pain. Plaintiff was prescribed Neurontin 400mg and he was encouraged to stretch the area. On February 10, 2016, Plaintiff sent a kyte to Defendant Beamer. Plaintiff stated, "My hip is killing me!" His pain had "gotten extremely worse since [he was] last seen." On February 18, 2016, Plaintiff reported severe pain rated 10 out of 10 to his right hip, right side, and his right testicle. Plaintiff was given a Toradol 50mg injection. On April 26, 2016, Plaintiff saw Defendant Beamer for a follow-up. Defendant Beamer requested that the TLC Committee evaluate whether a second lumbar epidural steroid injection was medically justified. The TLC Committee denied this request.

Plaintiff was transferred to Oregon State Penitentiary ("OSP") on June 28, 2016. According to Defendants, 24-hour nursing care is available at OSP.

Since transferring to OSP, Plaintiff has been in Ms. Mann's care. On August 10, 2016, Plaintiff was examined by Ms. Mann. Plaintiff reported sharp pains in his left buttock, radiating down to the outside of his thigh, knee, and ankle. Plaintiff also reported right testicle pain. While Plaintiff exhibited normal posture and a normal gait, he presented positive findings during the Faber test. Ms. Mann recommended stretches and over-the-counter pain medication. On August 31, 2016, Ms. Mann determined that Plaintiff showed no signs of neurological symptoms and that Plaintiff's Neurontin prescription was no longer appropriate. On October 12, 2016, Ms. Mann prescribed a trial regimen of Etodolac (Lodine) to treat Plaintiff's pain and reduce inflammation.

According to Ms. Mann, Plaintiff has stopped taking Etodolac as of December 2, 2016 due to a possible allergic reaction. Plaintiff has also received Toradol injections.

This action was filed on August 9, 2016.

**DISCUSSION**

Plaintiff's Eighth Amendment claims under Section 1983 are premised on (1) Defendant Beamer's inadequate medical care; (2) Defendant Wettlaufer's actions in failing to prevent inadequate medical care; and (3) Defendant Garton's actions in falsifying Plaintiff's medical records which led to Plaintiff's inadequate medical care. Plaintiff also alleges that Defendant Beamer was negligent in providing inadequate medical care. All of Plaintiff's claims are pled as arising out of injuries that occurred when Plaintiff fell down a flight of stairs on October 9, 2014 and the inadequate medical care he subsequently received.

## I.    Summary Judgment

### A.    Prison Litigation Reform Act

Under the Prison Litigation Reform Act ("PLRA"), incarcerated plaintiffs are required to exhaust all administrative remedies available to them within the institutions in which they are housed before bringing any federal action in connection with prison conditions, including such actions brought under 42 U.S.C. § 1983:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). For purposes of the PLRA, actions brought with respect to "prison conditions" include all actions brought to challenge isolated episodes of unconstitutional or otherwise unlawful misconduct of any kind as well as prisoner petitions challenging conditions of confinement. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Under the PLRA, the courts lack discretion to consider claims challenging prison conditions, including claims for money damages, except where such claims are filed following complete exhaustion of available administrative remedies, without regard to the nature of the administrative remedies available

under such administrative grievance procedures. *See id.* at 524, *citing Booth v. Churner*, 532 U.S. 731, 739, 740 n.5, 741 (2001).

Inmates are not required to plead or demonstrate exhaustion before bringing prison-conditions lawsuits. *Jones v. Bock*, 549 U.S. 199, 216 (2007). To the contrary, an incarcerated plaintiff's failure to satisfy the PLRA exhaustion requirement is an affirmative defense that is the burden of the defendant in a prison-conditions lawsuit to raise and prove. *See id.* Following the Ninth Circuit's *en banc* decision in *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014), the courts of the Ninth Circuit treat challenges to a prisoner's exhaustion of administrative remedies as motions for summary judgment if premised on proffered evidence, and as motions to dismiss for failure to state a claim if premised on the incarcerated plaintiff's pleading alone. *See Albino*, 747 F.3d at 1166. Here, Defendants have properly brought their evidence-based challenge to Plaintiff's exhaustion of administrative remedies as a motion for summary judgment.

"If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56." *Id.* However, "[i]f material facts are disputed, summary judgment should be denied, and [following such denial] the district judge rather than a jury should determine the facts." *Id.* The *Albino* court found that the defendant must first prove that there was an available administrative remedy and that the inmate did not exhaust that available remedy. *Albino*, 747 F.3d at 1172. Courts will look to the applicable regulations explaining the scope of the administrative review process, testimonial evidence from prison officials who administer the process, and whether prisoners were apprised of the grievance system. *Albino*, 747 F.3d at 1175 (looking to whether prisoners were aware of the grievance system); *Brown v. Valoff*, 422 F.3d 926, 937 (2005). If the defendant carries their initial burden, "the burden shifts to the prisoner to come forward with evidence showing that

there is something in [his] particular case that made the existing and generally available remedies effectively unavailable to [him]." *Id.* However, the ultimate burden of proof remains with the defendant. *Albino*, 747 F.3d at 1172.

For purposes of the PLRA, "complete exhaustion" of available administrative remedies requires that an inmate "complete the administrative review process in accordance with [all] applicable procedural rules, including deadlines. . . ." *Marella v. Terhune*, 568 F.3d 1024, 1027 (9th Cir. 2009), *quoting Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Indeed, as the Supreme Court established in *Woodford*, "proper exhaustion of administrative remedies. . . 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 90 (emphasis original), *quoting Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). The *Woodford* court reasoned that to hold otherwise would permit prisoners to render the PLRA exhaustion requirement "wholly ineffective" by defaulting in the performance of administrative requirements and then claiming exhaustion by virtue of such procedural default. *Id.* at 95. Under *Woodford*, only proper exhaustion of administrative requirements, including compliance with deadlines and performance of all procedural requisites, is sufficient to satisfy the requirements of the PLRA. *See id.* at 90-91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules. . . .").

**B.     Federal Claims**

Here, Defendants have met their initial burden of establishing that there was an available administrative remedy. EOCI Grievance Coordinator Nina Sobotta's declaration establishes that EOCI has an administrative review process in place and that inmates are apprised of the administrative review process through an Inmate Orientation Packet, through the inmate handbook, and through grievance instructions accompanying grievance forms.

Defendants have also established that Plaintiff failed to pursue all remedies available to him at EOCI in connection with three of the four grievances at issue. Plaintiff did not appeal or otherwise resubmit Grievance Nos. EOCI.2015.03.049, EOCI.2015.03.050, and EOCI.2015.10.078—grievances against Defendants Wettlaufer and Beamer. Plaintiff has not come forward with evidence establishing that the administrative review process was effectively unavailable to him. As such, the court lacks discretion to consider the merits of any claim arising out of these grievances.

On the other hand, Plaintiff pursued all remedies available to him at EOCI in connection with Grievance No. EOCI.2015.10.086—a grievance against Defendant Garton. Defendants admit that Plaintiff appealed Grievance No. EOCI.2015.10.086 twice, completing the grievance review process with respect to this grievance. Broadly construed, Grievance No. EOCI.2015.10.086 alleges that Defendant Garton falsified Plaintiff's medical records, preventing Plaintiff from receiving adequate medical care. While the attachment to this grievance also mentions Defendant Beamer, inmates must file a separate grievance for each grieved individual.[4] OAR 291-109-0140(5).

In short, drawing all reasonable inferences in favor of the nonmoving party and placing the ultimate burden of proof with the Defendants, this court lacks discretion to consider the merits of Plaintiff's federal claims against Defendants Beamer and Wettlaufer under the PLRA.[5] Because Plaintiff has exhausted his section 1983 claim against Defendant Garton, Plaintiff's section 1983 claim against Defendant Garton may proceed.

---

[4] The court finds that Grievance No. EOCI.2015.10.086 is properly construed as a grievance against Defendant Garton given that another grievance was filed against Defendant Beamer on the same day as Grievance No. EOCI.2015.10.086, addressing the same facts as Grievance No. EOCI.2015.10.086.

[5] The court would also note that Plaintiff agreed to dismiss his claim against Defendant Wettlaufer in Plaintiff's response to Defendant's partial motion for summary judgment.

## II. Preliminary Injunction

Plaintiff's motion for preliminary injunction fails as Plaintiff is not likely to suffer irreparable harm in the absence of preliminary relief. Plaintiff seeks a preliminary injunction against Defendants Garton and Beamer to ensure that Plaintiff is adequately treated for his alleged symptoms. Defendant Garton is EOCI's outside medical care coordinator and Defendant Beamer is an EOCI doctor. However, Plaintiff is no longer housed at EOCI. Plaintiff was transferred to OSP on June 28, 2016, a facility with 24-hour nursing capabilities. Plaintiff is under Ms. Mann's care at OSP. Issuing a preliminary injunction against Defendant Beamer or Defendant Garton would have no effect on Plaintiff's allegedly inadequate medical care. *See Easter v. CDC*, 694 F. Supp. 2d 1177, 1189–90 (S.D. Cal. 2010) (finding that the plaintiff would not suffer irreparable harm in the absence of preliminary relief where the plaintiff was no longer housed at the location where the defendants were employed).

While Plaintiff's motion for preliminary injunction also seeks a preliminary injunction against "the appropriate medical officials" upon his transfer to OSP, these officials are not parties to this action and have not submitted to the jurisdiction of this court. The court does not have jurisdiction to issue an injunction directing parties not before the court to take action. *Zepeda v. United States Immigration & Naturalization Servs.*, 753 F.2d 719, 727 (9th Cir. 1985) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court."); *see also Randolph v. Nix*, No. 1:12–cv–00392–LJO–MJS (PC), 2015 WL 2081091, at *2 (E.D. Cal. May 4, 2015) (finding that an inmate's motion for a preliminary injunction failed where it "require[d] directing parties not before the Court to take action"), 2015

WL 4112129 (July 8, 2015) (adopting F&R). Plaintiff's motion for preliminary injunction is denied.

## CONCLUSION

For the reasons stated above, Defendants' partial motion for summary judgment (# 49) is GRANTED, and Plaintiff's motion for preliminary injunction (# 4) is DENIED. Plaintiff's section 1983 claims against Defendants Beamer and Wettlaufer are dismissed without prejudice. Plaintiff's section 1983 claim against Defendant Garton and Plaintiff's negligence claim against Defendant Beamer may proceed at this stage of the proceedings.

Dated this 17th day of May, 2017.

Honorable Paul Papak
United States Magistrate Judge